# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LINDA LEE IRVING, | ) |
| | ) No. 12 CV 5519 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner, Social Security | ) |
| Administration, [1] | ) |
| | ) August 28, 2013 |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER

Plaintiff Linda Lee Irving seeks disability insurance benefits ("DIB") and supplemental security income ("SSI") based on her claim that she is unable to work because of numerous physical impairments. After her application was denied in a final decision by the Commissioner of the Social Security Administration, Irving filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court is Irving's motion for summary judgment seeking reversal of the Commissioner's decision. For the following reasons, Irving's motion is denied:

### Procedural History

Irving applied for DIB and SSI on February 2, 2009, claiming that she became unable to work as of June 1, 2008. (Administrative Record ("A.R.") 197.) After her claims were denied initially and upon reconsideration, (id. at 124, 132),

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Carolyn W. Colvin—who became the Acting Commissioner of Social Security on February 14, 2013—is automatically substituted as the named defendant.

Irving sought and was granted a hearing before an administrative law judge ("ALJ") (id. at 140). The ALJ held a hearing on September 30, 2010, at which Irving and a vocational expert provided their testimony. (Id. at 59-119.) On January 28, 2011, the ALJ issued a decision finding that Irving is not disabled within the meaning of the Social Security Act and denied her claim for benefits. (Id. at 10-26.) When the Appeals Council denied Irving's request for review, (id. at 1), the ALJ's denial of benefits became the final decision of the Commissioner, *see O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010). On July 13, 2012, Irving filed the current suit seeking judicial review of the Commissioner's decision. *See* 42 U.S.C. § 405(g). The parties have consented to the jurisdiction of this court. *See* 28 U.S.C. § 636(c).

## Facts

Irving, who currently is 56 years old, has not engaged in substantial gainful activity since June 1, 2008. Before that date, she worked as a caretaker for the elderly, a high school security guard, and a machine feeder at the Chicago Tribune. She also worked as a machine operator and packer at Turtle Wax, where she injured her right shoulder. Today, she claims that she is unable to work on account of this shoulder injury, as well as her asthma, chronic obstructive pulmonary disease ("COPD"), high blood pressure, polyps on her vocal cords, depression, knee pain, difficulty sleeping, an abnormal mammogram result, and some less tangible problems like a persistent cough, dizziness, weakness, and headaches. She also suffers from urinary incontinence and urgency. At the hearing before the ALJ, Irving presented both documentary and testimonial evidence in support of her

claim.  Following the hearing, the ALJ held the record open for 15 days to provide Irving additional time to submit other medical records.

## A.    Medical Evidence

Irving's medical record dates back to February 2003 when she underwent shoulder surgery to repair a torn right rotator cuff.  (A.R. 419.)  Her doctor implemented lifting restrictions after the surgery, but ultimately Irving was able to return to work.  (Id. at 420-21.)  A second shoulder surgery took place in July 2004.  (Id. at 425.)  This time, Irving's physician recommended that she avoid using her right arm for four to six months.  (Id. at 426-27.)  By December 2004, however, the record indicates that Irving was able to use her right arm to lift, push, and pull up to 20 pounds.  (Id. at 432.)  There may have been some restrictions on her ability to perform overhead lifting activities, but the medical notation is illegible.  (Id.)

The medical record further indicates that Irving has smoked cigarettes—as many as a pack or two a day—for 30 years.  (Id. at 335, 498.)  Her attempts to quit or cut back have been numerous, and it is clear that Irving has found it very difficult, if not impossible, to completely stop smoking.  (Id. at 336, 362, 498.)  Irving also has a long history of asthma.  In August 2007, Dr. Clifton Clarke of Provident Hospital filled out an Asthma and COPD Action Plan on Irving's behalf that provided instructions and medication doses depending on various symptoms.  (Id. at 409.)  In March 2009, Irving had surgery to remove a benign vocal cord polyp.  (Id. at 316.)

Irving also underwent two functional lung tests. The first lung exam, taken at Provident Hospital on June 19, 2007, reflects shortness of breath as the chief complaint. (Id. at 295.) The test came back indicating "a minimal obstructive lung defect." (Id. at 298.) The second lung test occurred on March 11, 2009, and revealed a mild decrease in diffusing capacity but normal spirometry and lung volumes, normal alveolar volume, and no need for home oxygen. (Id. at 441.)

In May 2009, Irving underwent a mammogram that revealed an irregular mass in her left breast. (Id. at 528.) However, an ultrasound taken in April 2010 revealed no suspicious abnormalities. (Id. at 518.) During this same time period, Irving also made repeated trips to Stroger Hospital for vaginal bleeding and urinary incontinence. Irving's doctors started her on various medications aimed at managing overactive bladder symptoms, (id. at 498), but Irving continued to complain of incontinence and urinary frequency—as frequently as every 30 minutes during the day and 5-10 times at night. (Id. at 498, 502, 504.)

In June 2009, Dr. Mahesh Shah examined Irving in furtherance of her disability claim and provided an Internal Medicine Consultative Examination. (Id. at 335-38.) He noted Irving's complaints of shortness of breath on exertion and coughing spells. (Id. at 335.) Dr. Shah also observed that Irving had suffered from high blood pressure for 30 years, but he noted that her blood pressure, asthma, and COPD were all under good control. (Id. at 338.) Concerning her right shoulder pain, he noted the scars from her two surgeries and mild tenderness and accordingly ordered an x-ray. (Id. at 334, 337.) The x-ray revealed no evidence of a

fracture, dislocation, or other abnormality. (Id. at 334.) He concluded that her right shoulder was normal. (Id. at 334.) In regard to her mental status, Dr. Shah described Irving as alert and oriented to time, place, and person. (Id. at 338.) He determined that her memory, appearance, behavior, and ability to relate during the examination fell within normal limits. (Id.) He tested her ability to heel-walk, toe-walk, and squat and found she was able to perform all of these activities. (Id.)

State medical examiner Dr. David Bitzer conducted a Physical Residual Functional Capacity Assessment of Irving in June 2009. (Id. at 345.) Dr. Bitzer noted Dr. Shah's diagnoses of pain in the right shoulder, history of asthma, high blood pressure (controlled), and COPD (controlled). (Id. at 345.) He also examined the medical records pertaining to her vocal cord surgery, her pulmonary function tests, and the medical notes from December 2008. (Id. at 347.) Dr. Bitzer concluded that Irving's various complaints (her inability "to do anything," poor sleep, difficulty dressing, lifting, reaching, walking, hearing, understanding, getting along with others, etc.) were disproportionate to the medical evidence in the file and thus were only "partially credible." (Id. at 350.) He noted, among other things, Dr. Shah's observation that Irving had walked into his office without any trouble and had moved around the office without assistance, that her blood pressure and motor strength were normal, and that her asthma and COPD were well-controlled. (Id. at 350.) Accordingly, Dr. Bitzer determined that Irving has the residual functional capacity ("RFC") to: lift and/or carry 50 pounds occasionally and 25 pounds frequently; stand and/or walk a total of about 6 hours in an 8-hour workday; sit for

a total of about 6 hours in an 8-hour workday; perform unlimited pushing and/or pulling; and occasionally reaching overhead with her right upper extremity. He also found that she must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation. (Id. at 346-49.)

Pursuant to Irving's reconsideration request, State Medical Examiner Dr. Ernst Bone reviewed all of the medical evidence up to that point, as well as Dr. Shah's assessment. (Id. at 364-66.) Dr. Bone affirmed Dr. Shah's findings and noted that, upon reconsideration, there were no allegations of new illnesses, injuries, or physical or mental limitations, nor any evidence of any significant changes in functioning. (Id. at 366.)

The medical record also contains reports from physician visits that occurred after the ALJ's September 30, 2010 hearing. In November 2010, Irving visited Dr. Chukwudozie Ezeokoli, an internal medicine doctor at Stroger Hospital. Dr. Ezeokoli noted during that visit that although Irving complained of some right shoulder tenderness, her shoulder was not swollen and that she showed "normal power globally" as to her extremities. (Id. at 545.) Regarding her asthma, Dr. Ezeokoli noted that although Irving complained of "[w]orsening [shortness of breath] with exertion," her last pulmonary function test did not show any obstructive airway disease or any significant difference with bronchodilators. (Id. at 545-46.) He noted that her high blood pressure was under "good control" and there were no symptoms of heart failure. (Id. at 546.) As for her mental state, Irving complained of feeling "on edge" and having trouble sleeping. (Id. at 545.)

Dr. Ezeokoli assessed her as having "significant symptoms of depression and feelings of hopelessness" and started her on Zoloft and Temazepam (an insomnia medication). (Id. at 546.) As for her physical health on the day of the exam, he noted that her chest sounds were clear with no wheezing, and her abdomen was soft and non-tender. (Id. at 545.) Regarding her urinary stress incontinence, he simply advised her to follow up with her gynecologist. (Id. at 546.)

Dr. Ezeokoli completed an RFC report about a week later, on November 12, 2010. In this report, he listed Irving's symptoms as "shortness of breath on exertion, chest pain, fatigue, dizziness, [and] anemia." (Id. at 554.) He identified "the clinical findings and objective signs" supporting his diagnoses as "wheezings, rales, shortness of breath, pedal edema, depression, and stress incontinence." (Id.) He found her incapable of doing even a "low stress" job because she gets "winded walking down a corridor." (Id. at 555.) He found her incapable of lifting 10 pounds or more and of rarely being able to lift less than 10 pounds. (Id. at 556.) He found her in need of having to rest 15 minutes out of every hour and wrote that she would likely miss more than four days of work per month. (Id. at 556-57.) He diagnosed her as having depression, high blood pressure, asthma, dyspnea, and GERD. (Id. at 554.)

## B.  Irving's Hearing Testimony

At the hearing, Irving described her work history, the nature of her conditions, and their limiting effects. She explained that while she worked as a machine operator at Turtle Wax, she routinely lifted 50 to 100 pounds and injured

her right shoulder as a result. (A.R. 72.) She received $9,000 in workers' compensation payments and underwent shoulder surgery to repair a torn rotator cuff. (Id. at 74-75.) Following her surgery, her duties were modified to eliminate the use of her right arm, as well as any significant lifting. (Id. at 93.) Still, she required a second shoulder surgery in 2004, and although Irving returned to Turtle Wax as an operator, she was limited to watching the machine and shutting it off when it jammed. (Id. at 95.) She also testified that she worked as a packer for three years and often lifted 10 to 20 pounds. (Id. at 72.) Irving more recently found work as a caretaker for the elderly. (Id. at 73-74.) Her work consisted of light cleaning, grocery shopping, making doctors' appointments, and cooking. (Id.)

Irving testified that she drives occasionally and participates in household chores but requires assistance from her husband to do laundry. (Id. at 75-76.) She goes grocery shopping with her daughter because it is too hard for her to go alone. (Id. at 76.) Irving also stated that she used to smoke a pack of cigarettes a day up until 2008, but that she now lights cigarettes and puts them in her mouth but does not inhale. (Id. at 77.) Despite her shoulder injury, she is able to eat and write with her right hand. (Id. at 78.) She is able to climb the stairs in her two-story home, but she can only walk half a block before tiring. (Id. at 86.) She can only stand up for about 20 minutes before tiring and needing to sit down. (Id.) After sitting for an hour, she must stand up and move around because her body begins to feel "tingly." (Id.)

Irving testified that she cannot work because she has "so many different aches in so many different parts of [her] body." (Id. at 79.) She also stated that the mobility in her right arm is limited due to pain, but that she only takes over-the-counter pain medicine because she has no medical insurance. (Id. at 84-85.) She has not been treated by a doctor for her right shoulder pain in two years. (Id.) Irving acknowledged that she can lift at least 20 pounds using both arms but states that most of the power comes from her left arm. (Id. at 85-86.) She explained that she must take six pills before bed every night to deal with her urinary problems. (Id. at 79.) The urinary problems occur both during the day and at night. (Id.) During the day she needs to urinate every half hour, and she wears diapers to deal with leakage. (Id. at 87-88.) She also testified that she hopes her medication will correct her urinary problems in the near future. (Id. at 83-84.) For her asthma, Irving uses an inhaler as well as various medications including Prednisone and Albuterol. (Id. at 81-82.) Irving has a home nebulizer machine that she uses intermittently. (Id. at 82.)

Irving stated that she has suffered from depression and received treatment at Mercy Hospital in or around 2007. (Id. at 100-01.) She believes that her urinary tract medication makes her depressed. (Id. at 79.) She has not been treated by any doctor for depression in the past two to three years. (Id.) However, she feels she cannot perform any of her previous jobs because she "doesn't have the motivation to keep the speed up." (Id. at 96.) She said that she "hurts a lot" and needs to go to the doctor three to four times a month. (Id. at 97.) She added that it would be

impossible for her to stand for eight hours a day, or even for four hours, and that her shortness of breath would interfere with her work.  (Id. at 97-98.)

**C.     Vocational Expert's Hearing Testimony**

Vocational Expert ("VE") Pamela Tucker answered the ALJ's questions regarding the kinds of jobs someone with certain hypothetical limitations could perform.  (A.R. 102.)  The ALJ posed two hypotheticals to the VE.  The ALJ first inquired whether there are any jobs available for an individual the same age as Irving, with the same educational background and work experience, and with the functional capacity to lift and carry 10 pounds frequently and 20 pounds occasionally, to sit up to six hours, to stand and walk up to six hours in an eight-hour day, to engage in unlimited pushing and pulling for that amount of lifting and carrying, and to reach occasionally above the shoulder with her right arm, with a limitation requiring her to avoid concentrated exposure to airborne pollutants.  (Id. at 109-10.)  The person also would be limited to simple, unskilled tasks.  (Id. at 110.)  The VE answered that such an individual would be capable of performing Irving's prior work as a packer or a machine feeder.  (Id.)

For the second hypothetical, the ALJ posited the same scenario as the first but with the added limitation that the person must have a sit/stand at will option. (Id.)  The VE responded that this individual could not work as a packer or machine feeder.  (Id.)  However, the VE opined that there are other jobs in the regional economy that such an individual could perform, such as an office helper, cashier, and mail clerk.  (Id.)  The VE noted that in those other jobs, 10% off-task time is

permitted, in addition to normal rest and break periods. (Id. at 111.) However, not more than one absence per month would be permitted. (Id.) More than 10% of off-task time would also eliminate the position, as would using the restroom more than once an hour for five minutes at a time. (Id. at 114-15.)

## D.    The ALJ's Decision

The ALJ concluded that Irving is not disabled under sections 216(i) and 223(d) of the Social Security Act. (Id. at 13.) In so finding, the ALJ applied the standard five-step sequence, *see* 20 C.F.R. § 404.1520(a)(4), which requires her to analyze:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [she] can perform [her] past relevant work; and (5) whether the claimant is capable of performing any work in the national economy.

*Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012). If at step three of this framework the ALJ finds that the claimant has a severe impairment that does not meet or equal one of the listings set forth by the Commissioner, she must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence." 20 C.F.R. § 404.1520(e). The ALJ then uses the RFC to determine at steps four and five whether the claimant can return to his past work or to different available work. (Id.); § 404.1520(f),(g).

Here, at steps one and two of the analysis, the ALJ determined that Irving has not engaged in substantial gainful activity since June 1, 2008, and that she has

the following severe impairments: asthma and status post-right rotator cuff repair. (A.R. 20.) Whether singly or in combination, the ALJ declined to characterize Irving's remaining medical problems as severe impairments, including vocal cord edema, hypertension, gastritis, urinary frequency, and depression. (Id.) At step three, the ALJ declined to find that Irving has an impairment or combination of impairments that meet or equal one of the listed impairments in 20 C.F.R. § 404, Subpart P., Appendix 1. (Id.) At step four, the ALJ concluded that Irving has the RFC to perform light work subject to certain modifications, including a sit/stand option. (Id.) At step five, the ALJ found that Irving's RFC allows her to work as an office helper, cashier, or mail clerk—jobs which include a sit/stand option. (Id. at 25.) Accordingly, the ALJ found that Irving is not under a disability as defined by the Social Security Act and denied her application for benefits. (Id.)

## Analysis

In her motion for summary judgment, Irving makes five challenges to the ALJ's decision. First, Irving argues that that the ALJ improperly afforded little weight to treating physician Dr. Chukwudozie Ezeokoli's report. Second, Irving argues that the ALJ improperly gave substantial weight to the findings of several state agency doctors. Third, Irving maintains that the ALJ neglected to classify several of her physical impairments as severe impairments and also failed to address their combined significance. Fourth, Irving contends that the ALJ's credibility assessment was not adequately supported. Fifth, Irving takes issue with the ALJ's RFC analysis. The court disagrees with each of these challenges.

This court's role in disability cases is limited to reviewing whether the ALJ's decision is supported by substantial evidence and is free of legal error. *See Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is that which "'a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard requires the ALJ to build a logical bridge between the evidence and her conclusion, but not necessarily to provide a thorough written evaluation of every piece of evidence in the record. *See Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). In asking whether the ALJ's decision has adequate support, this court will not reweigh the evidence or substitute its own judgment for the ALJ's. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

### A.     Dr. Ezeokoli's Report

About a month after the hearing, Irving had a visit with Dr. Ezeokoli, and about a week after that, he completed an RFC report in which he found Irving incapable of even a "low stress" job. (A.R. 554-58.) The ALJ afforded Dr. Ezeokoli's assessment "very little weight" and criticized the doctor's "extremely limiting opinion" as inconsistent with his treatment notes. (Id. at 23.) Irving argues on appeal that the ALJ failed to give Dr. Ezeokoli's report controlling weight.

The parties do not dispute that Dr. Ezeokoli served as Irving's treating physician. As a "treating source," Dr. Ezeokoli's opinion is entitled to controlling weight, provided it is "well-supported by medically acceptable clinical and

laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record. *See Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006) (*citing* 20 C.F.R. § 404.1527(d)(2)). An ALJ may discredit a treating source's medical record, however, if it is internally inconsistent or inconsistent with the opinion of a consulting physician—provided the ALJ minimally articulates her reason for crediting or rejecting evidence of disability. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). A decision to deny controlling weight to a treating source's opinion does not prevent the ALJ from considering it; the ALJ may still look to the opinion, even after opting to afford it less evidentiary weight. Exactly how much weight the ALJ affords depends on a number of factors, such as the length, nature, and extent of the physician's and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue. *See* 20 C.F.R. § 404.1527(d)(2)(i)-(ii), (d)(3), (d)(5).

The relevant issue here is whether the ALJ minimally articulated her reasons for rejecting Dr. Ezeokoli's report. The court finds that she did. In so ruling, the ALJ examined the contrasts between Dr. Ezeokoli's November 3, 2010 treatment notes and his November 12, 2010 RFC assessment. During the November 3rd physical examination, Dr. Ezeokoli noted Irving's complaint of right shoulder tenderness, but he also noted that her shoulder was not swollen and that

there was "normal power globally."[2]  (Id. at 545.)  Regarding her asthma, Dr. Ezeokoli noted that although Irving complained of "[w]orsening [shortness of breath] with exertion," her last pulmonary function test did not show any obstructive airway disease or any significant difference with bronchodilators."  (Id. at 545-46.)  He noted that her high blood pressure was under "good control" and that there were no symptoms of heart failure.  (Id. at 546.)  As for her mental state, Irving complained of feeling "on edge" and having trouble sleeping, but otherwise the medical notes do not indicate additional subjective complaints.  (Id. at 545.)  Nevertheless, Dr. Ezeokoli assessed her as having "significant symptoms of depression and feelings of hopelessness," and started her on Zoloft and Temazepam.  (Id. at 546.)  As for her physical health on the day of the exam, he noted that her chest sounds were clear with no wheezing, and her abdomen was soft and non-tender.  (Id. at 545.)  Regarding her urinary stress incontinence, he simply advised her to follow up with her gynecologist.  (Id. at 546.)  Contrast this assessment, then, with the RFC assessment written a week later, in which he listed her symptoms as "shortness of breath on exertion, chest pain, fatigue, dizziness, [and] anemia."  (Id. at 554.)  He identified "the clinical findings and objective signs" supporting his diagnoses as "wheezings, rales, shortness of breath, pedal edema, depression, and stress incontinence."  (Id.)  He found her incapable of doing even a "low stress" job

---

[2]  The court declines to further parse the meaning of this term, as Irving suggests, or to send Dr. Ezeokoli an interrogatory seeking clarification.  Whether the term "normal power globally" refers to just the right shoulder or to Irving's extremities collectively, the medical record contains other evidence, including the x-ray ordered by Dr. Shah, confirming that Irving's shoulder anatomy is normal.

because she gets "winded walking down a corridor." (Id. at 555.) He found her incapable of lifting 10 pounds or more and of rarely being able to lift under 10 pounds. (Id. at 556.) He found her in need of having to rest 15 minutes out of every hour, and predicted that she would likely miss work more than four days per month. (Id. at 556-57.) He diagnosed her as having depression, high blood pressure, asthma, dyspnea, and GERD. (Id. at 554.)

The ALJ noted these clear differences between the treating notes and the RFC assessment and in fact discussed many of them in her opinion. (Id. at 24.) As required by 20 C.F.R. § 404.1527(d), the ALJ explained her reasons for affording "very little weight" to Dr. Ezeokoli's opinion. She specifically mentioned the presence of pulmonary function tests, including one from 2009 (that Dr. Ezeokoli likewise mentioned in his treatment notes), showing "normal" capabilities, and she noted the complete absence of other medical evidence supporting either the diagnosis and/or treatment of depression. (Id.) She noted that despite the existence of some shoulder tenderness, Dr. Ezeokoli found Irving's extremities to have "normal power globally." The court will not disturb the ALJ's evaluation and in fact finds that Dr. Ezeokoli's RFC assessment bears the hallmarks of bias in favor of his patient. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("We must keep in mind the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.") (internal quotations and citations omitted); *see also Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir.

1995) (finding that the treating source's report regarding the claimant's inability to sit, stand, or walk appeared based on the claimant's own statements about his functional restrictions). While Dr. Ezeokoli may not have intended to succumb to bias, the disparity between the office exam on November 3, 2010, and his RFC assessment a week later reflects the likelihood that bias influenced his opinion with respect to the RFC.

Irving makes several additional arguments, some quite hard to follow, that Dr. Ezeokoli's opinion is entitled to controlling weight, but none of them changes the court's analysis. This court does not find that the ALJ cherry-picked evidence or "played doctor" by choosing to rely on a March 2009 pulmonary function test (referred to as well by Dr. Ezeokoli) instead of Dr. Ezeokoli's post-hearing RFC determination that Irving cannot walk down a hallway without suffering shortness of breath—which, it should be noted, was a conclusion not supported by any medical test. It is the claimant's burden to build the medical record. *See* 20 C.F.R. § 404.1512(a) (providing that the burden is on the claimant to "furnish medical and other evidence that [the SSA] can use to reach conclusions about your impairment"). Further, this court is satisfied that the ALJ more than minimally articulated her reasons for affording Dr. Ezeokoli's RFC assessment little weight. *See Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000) (stating that "an ALJ must 'minimally articulate his reasons for crediting or rejecting evidence of disability'") (citations omitted).

**B.    State Agency Doctors**

Irving also argues that the ALJ erroneously gave "substantial weight" to the opinions of Dr. Bitzer and Dr. Bone, both non-examining state agency doctors. Specifically, Irving takes issue with the ALJ's adoption of these doctors' findings that she is able to sit six hours of the day and to stand/walk six hours of the day. (A.R. 23.)  She contends that these reports, from June 2009, are outdated and "did not have the benefit of reviewing important information dated after that time, such as the December 30, 2009 CT scan findings and the 2010 evidence." (R. 15, Pl.'s Br. at 10).  These arguments lack merit.  The ALJ noted the absence of objective medical evidence corroborating Irving's complaints of being unable to stand or walk for prolonged periods. (A.R. 23.)  Irving does not explain how the 2009 CT scan, Dr. Ezeokoli's report, or other "important information" dated after June 2009 contradicts the ALJ's conclusion that Irving has the capacity to manage a modified light work assignment.  Irving's December 2009 CT scan revealed suspected enlarged tonsils. (Id. at 575.)  But an endoscopy of her esophagus and stomach in May 2010 revealed a normal esophagus, normal duodenum, and mild gastritis, with no mention made of any throat abnormalities. (Id. at 382.)  Similarly, the court fails to see how Dr. Ezeokoli's report constitutes new evidence.  As already discussed, Dr. Ezeokoli's report is not based on any new objective medical findings. Dr. Ezeokoli himself either relied upon other test results or recommended that Irving follow up with different clinics and specialists.  In sum, there is nothing in the record supporting Irving's contention that the findings of the state medical

examiners were outdated and lacking in more current information. Having articulated the reasons for rejecting Dr. Ezeokoli's report, the ALJ was within her rights to rely upon the reports of the state medical examiners. *See Liskowitz v. Astrue*, 559 F.3d 736, 742 (7th Cir. 2009) (finding that "the resolution of competing arguments based on the record is for the ALJ, not the court").

## C. Step-Two Analysis

Third, Irving argues that the ALJ erred in finding that she suffers from only two severe impairments—asthma and status post rotator cuff repair—and in failing to characterize her other medical problems, most notably her Pelvic Organ Prolapse and urinary incontinence, as severe impairments. The court disagrees. At step two of the five-step analysis, the ALJ examines whether the claimant in fact has an impairment or combination of impairments that is "severe." 20 C.F.R. § 404.1520(a)(4)(ii). "A severe impairment is an impairment or combination of impairments that "significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c). The burden rests with the claimant to prove that the impairment is severe. *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). In addition, step two is considered a "threshold step," which means that "[a]s long as the ALJ determines that the claimant has one severe impairment, the ALJ will proceed to the remaining steps of the evaluative process." *Id.* at 926-27. The Seventh Circuit has made clear that when an ALJ proceeds beyond step two (and step three) and considers a claimant's severe and non-severe impairments at step

four, any purported error at step two is considered harmless. *See Arnett v. Astrue,* 676 F.3d 586, 591 (7th Cir. 2012).

In this case, the ALJ did find the existence of two severe impairments at step two and thus proceeded onwards in the five-step sequential analysis. At step three, the ALJ concluded that the impairments she already had identified as "severe" did not meet any of the listings. Accordingly, the ALJ proceeded to step four, at which time she considered all of Irving's impairments—including her urinary frequency and incontinence problems—when making her RFC determination. Because the ALJ proceeded beyond step two and considered Irving's severe and non-severe impairments at step four, any purported error at step two is considered harmless and therefore not reversible error. *Id.* at 591.

## D.    Credibility Analysis

Next, Irving argues that the ALJ improperly assessed her credibility by resorting to boilerplate language[3] and discounting her hearing testimony. The relevant issue here is whether the ALJ offered reasons grounded in evidence to explain her determination that Irving lacks credibility. Irving has a particularly high hurdle to overcome here because this court may only overturn an ALJ's credibility assessment if it is "patently wrong." *See Skarbek*, 390 F.3d at 504-05. That means that this court will not substitute its judgment regarding the claimant's

---

[3] The Seventh Circuit has made it clear that an ALJ's use of the objectionable boilerplate language does not amount to reversible error if she "otherwise points to information that justifies [her] credibility determination." *See Pepper*, 712 F.3d at 367-68. Accordingly, there is no need to reverse based on an ALJ's use of this boilerplate where she gave other reasons, grounded in evidence, to explain her credibility determination. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

credibility for the ALJ's, and Irving "must do more than point to a different conclusion that the ALJ could have reached." *See Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010).

The ALJ found Irving to lack credibility in several respects. She found Irving not credible with regard to her assertion that she stopped smoking—noting specifically that despite having claimed to have quit smoking, Irving admitted at the hearing to frequently placing lighted cigarettes in her mouth. (A.R. 21, 23.) With respect to her shoulder pain, the ALJ noted that Irving has not had any treatment for it in the last two years and is able to alleviate her pain with over-the-counter medications. (Id.) While Irving maintained at the hearing that she could not afford treatment for her shoulder because she lacks medical insurance, the record shows that she has an extensive history of medications, examinations, and tests, and there is no indication (or developed argument on appeal) that Irving had to forego medical care because she lacked insurance. The record also shows that state medical consultant Dr. Bitzer determined that Irving's complaints of right shoulder pain were disproportionate to the x-ray on file. (Id. at 350.) The ALJ also noted in her decision that although Irving complained of two "vegetative" symptoms of depression—feeling depressed and hopeless—there is no medical evidence of record reflecting psychiatric treatment of any kind. (Id. at 20, 23.) Finally, the ALJ noted Irving's own testimony that while she has many health problems, her doctors cannot find a solution for many of them. (Id. at 21-22.) In sum, the court finds that the ALJ more than minimally articulated her reasons for discounting Irving's

credibility and thus there is no basis upon which to find her ruling "patently wrong." *See Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008); *Skarbek*, 390 F.3d at 503 (finding that the ALJ "minimally articulated [her] reasons for crediting or rejecting evidence of disability").

**E.     The ALJ's RFC Determination**

Irving very generally challenges the ALJ's RFC determination by raising many of the same arguments previously asserted in other contexts.  Mainly, she argues that as a result of her myriad health problems she lacks "the ability to remain on task to sustain employment," and she refers the court back to the medical record for examples of how she is unable to manage work.  (R. 15, Pl.'s Br. at 12.)  Irving also contends that the ALJ failed to discuss some of her medical conditions when crafting the RFC.  The court disagrees.

The RFC determination represents the maximum Irving can do, despite her limitations, on a "regular and continuing basis," which means roughly eight hours a day for five days a week.  *See Pepper*, 712 F.3d at 362.  To this end, the ALJ found that Irving has the RFC to:

> lift and/or carry 10 pounds frequently and 20 pounds occasionally.  She can sit up to 6 hours; and stand/walk up to 6 hours in an 8 hour workday; with a sit/stand option at will.  Pushing and pulling are unlimited.  She is limited to occasional reaching above the shoulder with the right upper extremity; and should avoid concentrated exposure to airborne pollutants.  She is limited to performing simple, unskilled tasks. She may be off task 10 percent of the time in addition to normal breaks and absent one day per month.

(A.R. 20.)  At the hearing, Irving testified that she continues to use her right hand for eating and writing and can still lift at least 20 pounds using both arms.  (Id. at

78, 86.)  While the ALJ found that medical evidence failed to support the extent of Irving's complaint of shoulder pain, she nevertheless restricted her lifting and carrying to 10 pounds frequently and 20 pounds occasionally and limited her to only occasional reaching above the shoulder with her right arm.  (Id. at 23.)  Irving also complains of pain, fatigue, depression, and an inability to stand or walk for sustained periods of time, yet—as the ALJ noted and this court already has discussed—the objective medical evidence does not support these complaints.  In any event, the ALJ added a sit/stand option into Irving's RFC to enable her to sit and stand at will during the day.  Regarding her complaints of urinary frequency, again the ALJ addressed this problem by allowing for hourly breaks.  Irving contends that this is not good enough—arguing essentially that she cannot control her bladder for an hour at a time and thus cannot work.  But as the ALJ noted in her decision, Irving wears Depends adult diapers and changes them a few times a day, as needed.  Furthermore, a urogynecologist examined Irving in November 2010 and advised her to continue with her medications and consider management of her symptoms through the use of a pessary or through surgery.  (Id. at 548-51.)  There are no further medical records indicating what course of action Irving chose to take, if any.  However, 20 C.F.R. § 416.930(a) makes clear that "[i]n order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  As of the hearing date, including the period of time leading up to the ALJ's written determination, Irving had yet to undergo a single procedure aimed at restoring her urinary tract health other than through the use of

medications—a course Irving said that she hoped would be successful. (Id. at 83-84.) In sum, the ALJ's RFC determination adequately built a logical bridge between the evidence before her and her conclusion that Irving is not disabled. *See Kastner*, 697 F.3d at 646. And to the extent Irving argues that the ALJ failed to consider every piece of evidence in the almost 600-page medical record, the court notes that the ALJ's assessment is consistent with the Seventh Circuit's repeated holding that "an ALJ's 'adequate discussion' of the issues need not contain 'a complete written evaluation of every piece of evidence.'" *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011) (*quoting Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)).

## Conclusion

For the foregoing reasons, Irving's motion for summary judgment is denied and the Commissioner's decision is affirmed.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**